UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 23-5030
(C.A. No. 21-0474)

QUENTIN BORGES-SILVA,                                    Appellant,

v.

MICHAEL S. REGAN, Administrator,
U.S. Environmental Protection Agency,                    Appellee.

## APPELLEE'S MOTION FOR SUMMARY AFFIRMANCE

Appellee Michael S. Regan, Administrator of the United States Environmental Protection Agency, respectfully moves for summary affirmance of the Honorable Magistrate Judge Zia M. Faruqi's (i) August 8, 2022 Minute Order denying plaintiff's motion to stay the proceedings, and (ii) January 13, 2023 Memorandum Opinion and Order granting the Administrator's motion for summary judgment, *see* R.27, 28.[1]  The "merits of this appeal are so clear as to make summary affirmance proper," *Walker v. Washington*, 627 F.2d 541, 545 (D.C. Cir. 1980) (per curiam), and "no benefit will be gained from further briefing and argument of the issues presented," *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987) (per curiam).

---

[1]    Copies of the Memorandum Opinion and Order are attached.

## BACKGROUND

### I.     Borges-Silva Was Removed After Failing His Performance Improvement Plan.

Borges-Silva is a man born in 1965.  R.1 ¶¶ 6, 8.  The Environmental Protection Agency ("Agency") employed Borges-Silva as an Environmental Protection Specialist in the Communication Services Branch ("Branch"), Field and External Affairs Division, Office of Pesticide Programs.  R.14-2 ¶ 1; R.22-1 ¶ 1. Borges-Silva was the only Branch employee whose primary responsibility was responding to webmail inquiries.  R.14-2 ¶ 7; R.22-1 ¶ 7.  A webmail is an inquiry from the public submitted through the "Contact Us" portal of the Office of Pesticide Programs' webpage.  R.14-2 ¶ 6; R.22-1 ¶ 6; *see also* R.22-7 at 256–58 (webmail with response).  Borges-Silva's secondary duties were to handle communications deliverables related to pollinator and certain pesticides.  R.14-2 ¶ 8; R.22-1 ¶ 8.

Borges-Silva's first-line supervisor was Branch Chief Gregory Siedschlag, R.14-2 ¶ 2; R.22-1 ¶ 2, and his second-line supervisor was Field and External Affairs Division Director Jackie Mosby.  R.14-2 ¶ 3; R.22-1 ¶ 3.  Siedschlag initially served as the Branch Chief on an acting basis from March 18, 2018, to July 14, 2018, and then served permanently from March 17, 2019, through Borges-Silva's removal from service in February 2020.  R.14-2 ¶ 4; R.22-1 ¶ 4.

The 2019 federal government shutdown, which lasted from approximately December 31, 2018, through January 29, 2019, saw the growth of a 300-unanswered-

webmail backlog.  R.14-2 ¶ 9; R.22-1 ¶ 9.  On March 19, 2019, almost two months later, the backlog had barely decreased, remaining at 270 webmails.  R.14-2 ¶ 11; R.22-1 ¶ 11.  On March 20, 2019, during his first meeting with Borges-Silva, Siedschlag relayed his concern to Borges-Silva about the backlog.  R.14-2 ¶ 12; R.22-1 ¶ 12.

That same day, Siedschlag tasked three employees from the Branch to assist Borges-Silva with addressing the backlog of webmail responses.  R.14-2 ¶ 13; R.22-1 ¶ 13.  These employees were one or two grades lower than Borges-Silva and did not have primary responsibility for addressing webmails.  R.14-2 ¶¶ 7, 13; R.22-1 ¶¶ 7, 13.  The individual who was one grade lower than Borges-Silva made her way through 75 webmails at a rate of 5.3 minutes per webmail.  R.14-2 ¶ 15; R.22-1 ¶ 15.  The individuals who were two grades lower made their way through 70 and 72 webmails, respectively, each at a rate of 10.1 minutes per webmail.  R.14-2 ¶¶ 16–17; R.22-1 ¶¶ 16–17.  After these employees completed this project, the webmail backlog was significantly reduced.  R.14-2 ¶¶ 14, 19; R.22-1 ¶¶ 14, 19.

Between March 29, 2019, and September 4, 2019, the backlog redoubled: from 61 webmails (March 29, 2019), to 134 (May 22), to 234 (July 5), to 510 (August 30), more than it had been upon the conclusion of the government shutdown.  R.14-2 ¶¶ 9, 19; R.22-1 ¶¶ 9, 19.  On July 5, 2019, Siedschlag tasked Borges-Silva with eliminating the backlog by August 30, 2019, and to complete on

3

average at least 25 webmail responses per workday. R.14-2 ¶ 21; R.22-1 ¶ 21. If Borges-Silva would have completed responses at the same rate as had the individual who was one grade lower than him (and whose primary responsibility, in contrast, was not to respond to these webmails), this would have taken less than two hours and thirteen minutes per day. R.14-2 ¶ 15 (5.3 minutes per webmail), 21; R.22-1 ¶ 15, 21. Even if Borges-Silva needed to take as long as the individuals two grades below him, this would have taken less than four hours and thirteen minutes per day. R.14-2 ¶¶ 16–17 (10.1 minutes per webmail), 21; R.22-1 ¶¶ 16–17, 21.

Between July 8, 2019, and August 30, 2019, Borges-Silva responded to an average of 10.5 webmail inquiries per workday. R.14-2 ¶ 22; R.22-1 ¶ 22. During a September 27, 2019 meeting, Siedschlag informed Borges-Silva that he intended to place him on a Performance Improvement Plan ("PIP"). R.14-2 ¶ 25; R.22-1 ¶ 25. On October 23, 2019, Siedschlag formally placed Borges-Silva on a PIP. R.14-2 ¶ 26; R.22-1 ¶ 26; *see also* R.14-10 (PIP).

The PIP period lasted from October 28, 2019, through November 27, 2019. R.14-2 ¶ 27; R.22-1 ¶ 27. As part of the PIP, Borges-Silva was expected to achieve at least Minimally Satisfactory performance in designated assignments, including preparing an average of at least 25 webmail responses per workday. R.14-2 ¶ 28; R.22-1 ¶ 28. Throughout the PIP period, Borges-Silva responded to an average of only 13.6 webmail responses per workday. R.14-2 ¶ 33; R.22-1 ¶ 33. Of the 244

responses he completed during the PIP period, 45% were verbatim standard responses, in which the entire webmail response was copied-and-pasted from a standard response document and an additional 26% of responses used verbatim standard responses as the primary source of the response.  R.14-2 ¶ 34; R.22-1 ¶ 34.

Both prior to and during the PIP period, Siedschlag told Borges-Silva to focus on webmail inquiries that would take less than twenty minutes to complete.  R.14-2 ¶ 31; R.22-1 ¶ 31.  Despite this direction, and despite that responding to webmails was Borges-Silva's primary responsibility, Borges-Silva testified that, during the PIP period, he did not treat responding to webmail inquiries as his top priority unless an incoming message appeared urgent.  R.14-2 ¶¶ 7, 31–32; R.22-1 ¶¶ 7, 31–32. Shortly after the PIP period concluded, the webmail backlog was up to 690, with some pending since July 2019.  R.14-2 ¶¶ 35–36; R.22-1 ¶¶ 35–36.  On January 17, 2020, Siedschlag informed Borges-Silva of the results of the PIP and proposed his removal.  R.14-2 ¶ 37; R.22-1 ¶ 37; *see also* R.14-11 (PIP results); R.14-12 (notice of proposed removal).

Director Mosby was the deciding official for Borges-Silva's proposed removal.  R.14-2 ¶ 38; R.22-1 ¶ 38.  On February 14, 2020, Director Mosby issued her decision to implement the proposed removal, effective February 16, 2020. R.14-2 ¶ 40; R.22-1 ¶ 40; R.14-13 at 2–5 (removal decision).  In deciding to remove Borges-Silva, Director Mosby determined that Siedschlag's expectations for the PIP

were reasonable and that it was reasonable to require Borges-Silva to complete an average of 25 webmail messages per workday.  R.14-2 ¶ 41; R.22-1 ¶ 41.

## II.    <u>The District Court Granted Summary Judgment After Discovery.</u>

On March 20, 2019, immediately after Siedschlag raised his concerns about the backlog with Borges-Silva, Borges-Silva contacted an equal employment opportunity ("EEO") counselor in the Agency's Office of Civil Rights.  R.22-3 at 8–9.  Ultimately, Borges-Silva litigated multiple administrative claims, including (1) the underlying administrative claim for this civil action regarding his removal by Director Mosby, purportedly for sex or age discrimination or retaliation and (2) an administrative claim regarding his placement on the PIP by Siedschlag, also for sex or age discrimination or retaliation.  R.1 ¶¶ 55, 57.  Prior to issuance of a Final Agency Decision, Borges-Silva initiated this civil action regarding his removal on February 24, 2021.  R.1 ¶ 58.  Meanwhile, he continued litigating the action regarding his placement on the PIP before an Administrative Judge.  *See* R.16-1 at 2–17.

The parties completed liability discovery on February 28, 2022.  R.13 ¶ 1.  The Administrator moved for summary judgment on April 28, 2022.  R.14.

On June 9, 2022, the Administrative Judge handling Borges-Silva's separate action regarding his placement on the PIP issued a decision.  R.16-1 at 2.  The Administrative Judge dismissed Borges-Silva's age discrimination claim, but

otherwise ruled in his favor.  R.16-1 at 3.  With Borges-Silva's response to the Administrator's summary judgment motion in this civil action due shortly thereafter, the Administrator consented to a 60-day extension of time for his response.  R.15 at 1–2; Min. Order (July 12, 2022) (granting extension).

On July 27, 2022, Borges-Silva instead filed a "motion for issue preclusion and for a stay on the opposition for summary judgment on the issues that remain on summary judgment per the EEOC case that found in the Plaintiff's favor."  R.16 at 1. On August 8, 2022, the District Court denied Borges-Silva's motion without prejudice and directed him to include any issue preclusion arguments in his opposition to the Administrator's summary judgment motion.  Min. Order (Aug. 8, 2022).

After another extension, Min. Order (Aug. 12, 2022), Borges-Silva filed his opposition to the Administrator's summary judgment motion on October 18, 2022. R.22.  Embedded in his opposition were 161 enumerated paragraphs styled as his statement of counter-facts.  R.22 at 4–28.  Borges-Silva separately responded to the Administrator's statement of facts, admitting without qualification thirty-eight of the forty-three enumerated facts and largely admitting most of the remaining enumerated facts.  R.22-1 at 1–2.  In connection with his opposition, Borges-Silva attached a hodgepodge of lengthy, unfocused attachments (R.22-2–R.22-7), including the entire 1,577-page record of investigation regarding Borges-Silva's

separate administrative proceeding (R.22-3).  Many of these exhibits are included in the same Electronic Case Filing system ("ECF") entries, making it impossible to discern where one exhibit ends and the next begins without sifting through the ECF entries.  *See, e.g.*, R.22-2; R.22-4; R.22-5; R.22-6; R.22-7.  In aggregate, Borges-Silva's opposition and attachments total 3,514 pages.

The Administrator filed a reply, R.25, including a paragraph-by-paragraph response to Borges-Silva's embedded counter-statement of facts, R.25-1.

Meanwhile, earlier in the summer, Borges-Silva began posting on the internet about his feelings toward Siedschlag and everyone whom he believed has wronged him.  R.25-4 at 2–5.  Borges-Silva wrote that Siedschlag was a "lying psychopath, shallow-chested beta male supervisor."  R.25-4 at 4.  Borges-Silva referred to undersigned counsel with a cuss word, called agency counsel "EPA's Lying Sack o' Crap (LSo'C) lawyer," and repeatedly referred to a Merit Systems Protection Board Administrative Judge as "grrl-boss."  *Id.* at 4–5; *see also id.* at 5 ("The MSPB grrl-boss said on the call today that she'd call him at 2pm and then contact my attorney, Morris Fischer, to advance the negotiations.  We didn't hear anything from either LSo'C [name redacted] or MS[PB] grrl-boss for the rest of the day.  They're all a bunch of lying scumbags.").

On January 13, 2023, the District Court granted the Administrator's motion for summary judgment.  The opinion begins with a meticulous background section

that provides clear citations to the relevant portions of the record.  R.28 at 2–5.
Despite the opposition's voluminous, unfocused attachments, the District Court
confirmed that it had reviewed "each exhibit and submission from the parties in
support of and in opposition to the pending motions."  R.28 at 2 n.2.

The District Court dispensed with Borges-Silva's issue preclusion argument.
R.28 at 7–8.  "By Borges-Silva's own omission, the issue in the EEOC case is: '[w]as
the PIP valid?'"  R.28 at 8 (quoting R.22 at 30).  "However, the issues here are
(1) whether Defendant articulated legitimate nonretaliatory and nondiscriminatory
reasons for removing Borges-Silva and (2) whether Borges-Silva rebutted
Defendant's articulated reasons with evidence of pretext."  *Id.*  Because "the same
issue now being raised [was not previously] contested by the parties and submitted
for judicial determination in the prior case," Borges-Silva's issue preclusion
argument fails.  R.28 at 7–8 (quoting *Yamaha Corp. of Am. v. United States*, 961
F.2d 245, 254 (D.C. Cir. 1992)).

The District Court then determined that the Administrator met his burden to
demonstrate a legitimate, nondiscriminatory, and nonretaliatory reason for Borges-
Silva's removal.  R.28 at 8–13 (citing *Figueroa v. Pompeo*, 923 F.3d 1078 (D.C.
Cir. 2019)).  Borges-Silva undisputedly failed the PIP, R.14-2 ¶¶ 28, 33, 36; R.22-1
¶¶ 28, 33, 36, and Borges-Silva admitted that "[i]n deciding to remove Plaintiff,
Director Mosby determined that Mr. Siedschlag's expectations during the PIP were

9

reasonable (*i.e.*, that it was reasonable for Plaintiff to complete an average of 25 webmail messages per workday and that it was reasonable for Plaintiff to reduce the webmail inquiry backlog)." R.14-2 ¶ 41; R.22-1 ¶ 41.

Lastly, the District Court considered Borges-Silva's claims of pretext. R.28 at 13–17. It addressed each of Borges-Silva's assertions before concluding that he had failed to meet his burden to demonstrate pretext. *Id.* (citing *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)). Accordingly, the District Court granted summary judgment to the Administrator. R.27 at 1.

This appeal followed.

## ARGUMENT

The Court's review of the District Court's denial of a stay is reviewed for abuse of discretion. *See Gordon v. Fed. Deposit Ins. Corp.*, 427 F.2d 578, 580 (D.C. Cir. 1970). Its review of the District Court's grant of summary judgment is *de novo*. *See Gilvin v. Fire*, 259 F.3d 749, 756 (D.C. Cir. 2001).

## I.    The District Court Was Well Within Its Discretion When It Denied a Motion for Stay of Indefinite Duration.

The District Court has considerable discretion in denying a stay of proceedings. *See Gordon*, 427 F.2d at 580. Here, Borges-Silva's "motion for issue preclusion and for a stay on the opposition for summary judgment on the issues that remain" made no reference to the stay purportedly being requested except in the

motion's title.  R.16 at 1–5.  It is unclear when Borges-Silva anticipated the stay

being lifted or what Borges-Silva expected to happen during the stay.  R.16 at 1–5.

The District Court instead freely granted Borges-Silva extensions of time for

his opposition deadline.  Min. Order (July 12, 2022); Min. Order (Aug. 12, 2022).

Thus, a brief that originally should have been filed on June 13, 2022, Min. Order

(Mar. 2, 2022), was ultimately filed on August 25, 2022, R.22, approximately four

months after the Administrator filed his summary judgment motion, R.14.  The

District Court acted well within its discretion in denying a stay of indefinite duration

and unclear purpose and instead granting Borges-Silva multiple extensions.

## II.     **The Administrative Judge's Decision Lacks Preclusive Effect.**

The District Court was not precluded from deciding the issues before it.  To

establish issue preclusion,[2] a party must meet three requirements: (1) "the same issue

now being raised must have been contested by the parties and submitted for judicial

determination in the prior case"; (2) "the issue must have been actually and

necessarily determined by a court of competent jurisdiction in that prior case"; and

(3) "preclusion in the second case must not work a basic unfairness to the party

bound by the first determination."  *Yamaha*, 961 F.2d at 254.  As this Court has

---

[2]     Borges-Silva argued for issue preclusion, not claim preclusion.  R.22 at 28–31; R.16 at 1–5.  He has waived any arguments regarding claim preclusion, which would fail in any event for the same reasons his issue preclusion arguments fail.

explained, "'among the most critical guarantees of fairness in applying collateral estoppel,' a.k.a. issue preclusion, 'is the guarantee that the party to be estopped had not only a full and fair opportunity but an adequate incentive to litigate "to the hilt" the issues in question.'" *Hurd v. District of Columbia*, 864 F.3d 671, 680 (D.C. Cir. 2017) (quoting *Haring v. Prosise*, 462 U.S. 306, 311 (1983)). Thus, "issue preclusion does not apply if '[t]he party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action.'" *Id.* (quoting Restatement (Second) of Judgments § 28(1)).

Here, the problems with Borges-Silva's issue preclusion argument are legion. First, Borges-Silva's performance during the PIP and his subsequent removal for unacceptable performance were not litigated in the proceeding before the Administrative Judge, which instead concerned the propriety of Borges-Silva's initial placement on the PIP. *See New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001) ("Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment[.]"); R.16-1 at 3–17. Accordingly, the Administrator is not precluded from defending Director Mosby's removal decision.

Second, at the time of the District Court's decision (and still today), the parties were actively engaged in an appeal of the Administrative Judge's decision. *See* R.26

at 1.  The Office of Federal Operations may ultimately rule in the Agency's favor, *see* 29 C.F.R. § 1614.403(a), and Borges-Silva may ultimately seek *de novo* review in district court.  *Chandler v. Roudebush*, 425 U.S. 840, 846, (1976).[3]

Third, to the extent that Borges-Silva seeks to use the Administrative Judge's finding regarding Siedschlag's decision to place Borges-Silva on a PIP as a basis for imputing discriminatory or retaliatory animus to Director Mosby's removal decision, his argument fails.  This Court has explained that a plaintiff may on occasion show that a decision maker violated Title VII because of someone else's earlier improper motive, but to do so, the plaintiff must establish that the decision maker was a cat's paw.  *Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015). To prevail on a cat's-paw theory, the employee should show that "[1] [the] supervisor performs an act motivated by [discriminatory] animus [2] that is *intended* by the supervisor to cause an adverse employment action, and . . . [3] that act is a proximate cause of the ultimate employment action."  *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (alterations and emphasis in original) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)).  Here, Borges-Silva improperly attempted

---

[3]      When Borges-Silva moved for issue preclusion, R.16, the Agency's time to appeal the Administrative Judge's preliminary decision had not started to run yet, as the Administrative Judge still needed to make findings on damages and a final decision had not even been issued yet.  *See* R.26 at 1.

to bypass this analysis and impose some sort of strict liability with no basis in law. R.22 at 31.

Borges-Silva never invoked a cat's paw theory. *See generally* R.22. Because he did not invoke a cat's paw theory, the Court should not consider it in the first instance. *See Arnoldi v. Bd. of Trs. Nat'l Gallery of Art*, No. 21-5182, 2022 WL 625721, at *1 (D.C. Cir. Mar. 1, 2022) (per curiam) (granting summary affirmance and "declin[ing] to consider appellant's 'cat's paw' theory of liability, which she raises for the first time on appeal" because "litigants must 'apprise[ ] the district court with sufficient clarity' of the arguments they intend to raise.") (quoting *Cruz v. Am. Airlines, Inc.*, 356 F.3d 320, 329 (D.C. Cir. 2004)).

Nor would a cat's paw theory have salvaged Borges-Silva's argument. Only after Borges-Silva failed the PIP, which is not disputed, R.14-2 ¶¶ 28, 33; R.22-1 ¶¶ 28, 33, did Siedschlag propose his removal, R.14-2 ¶ 37; R.22-1 ¶ 37. "In deciding to remove Plaintiff, Director Mosby determined that Mr. Siedschlag's expectations during the PIP were reasonable (*i.e.*, that it was reasonable for Plaintiff to complete an average of 25 webmail messages per workday and that it was reasonable for Plaintiff to reduce the webmail inquiry backlog)." R.14-2 ¶ 41; R.22-1 ¶ 41. Indeed, Director Mosby conducted her own "careful evaluation of the information [she] received in the Notice of Proposed Removal as well as [Borges-Silva's] Written Reply," determined that the requirement that Borges-Silva complete

14

on average 25 webmails per day was reasonable and achievable, and determined that Borges-Silva failed to meet that requirement in his PIP. R.14-16 ¶ 46. Given Director Mosby's undisputed evaluation of the reasonableness of the PIP and Borges-Silva's undisputed failure of the PIP, Borges-Silva cannot successfully invoke a cat's paw theory. Accordingly, Borges-Silva's issue-preclusion argument fails several times over.

## III. The District Court Properly Granted Summary Judgment Because the Material Facts Are Undisputed and Borges-Silva Failed to Meet His Burden to Establish Pretext.

Where, as here, "an employer asserts a legitimate, non-discriminatory reason for an adverse employment action," the singular "central inquiry" is "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008). The District Court considered the evidence in the light most favorable to Borges-Silva and properly concluded that he failed to meet his burden. R.56, at 15–20; *see also Nagi v. Buttigieg*, No. 22-5242, 2023 WL 2441684, at *1 (D.C. Cir. Mar. 6, 2023) (granting summary affirmance where plaintiff failed to meet his burden to demonstrate pretext); *Mason v. Henderson*, No. 02-5404, 2003 WL 22433765, at *1 (D.C. Cir. Oct. 27, 2003) (same).

Absent contrary evidence from Borges-Silva, no reasonable person could conclude that the real reason that Director Mosby removed Borges-Silva was his protected characteristics or prior EEO activity. This Court has "consistently declined to serve as a 'super-personnel department that reexamines an entity's business decisions.'" *Holcomb v. Powell*, 433 F.3d at 889, 897 (D.C. Cir. 2006). It should again decline to do so in this case, as the evidence in the record amply supports Director Mosby's removal decision. The undisputed evidence in the record demonstrates that Director Mosby reasonably concluded that Borges-Silva failed to meet Siedschlag's reasonable expectations for acceptable performance. R.14-2 ¶¶ 33–36, 41; R.22-1.

Borges-Silva primarily objects to the PIP itself. He admits, however: (1) that he averaged 13.6 webmails responses per workday; (2) he completed a total of 244 webmail responses during the PIP period; and (3) that throughout the PIP period, there were approximately 700 webmail inquiries pending a response, including webmail inquiries dating to July 2019. R.14-2 ¶¶ 33–36; R.22-1. His actual performance during the PIP period contrasted sharply with the Minimally Satisfactory performance standards in the PIP, including that he average at least 25 webmail responses per workday. R.14-2 ¶ 28; R.22-1 ¶ 28. Borges-Silva admits that the data regarding his webmail response output is accurate. R.14-2 ¶ 19; R.22-1 ¶ 19.

Borges-Silva's additional admissions further support the reasonableness of the PIP and Director Mosby's removal decision. He admits that Siedschlag met with him weekly during the PIP period to provide feedback and guidance. R.14-2 ¶ 30; R.22-1 ¶ 30. He admits that Siedschlag counseled him on numerous occasions to focus on answering webmail inquiries that would take less than 20 minutes to complete. R.14-2 ¶ 31; R.22-1 ¶ 31. Although responding to webmail inquiries was Borges-Silva's primary responsibility during the PIP period, he admits that he did not prioritize responding to webmails, unless there appeared to be an urgent inquiry. R.14-2 ¶ 32; R.22-1 ¶ 32. He admits that 71% of his webmail responses completed during the PIP period were exclusively or primarily copied-and-pasted from a standard response document. R.14-2 ¶ 34; R.22-1 ¶ 34. He admits that three lesser-graded co-workers who assisted with reducing the webmail backlog in March 2019 had response times that averaged approximately five or ten minutes per webmail inquiry, despite having far less experience than Borges-Silva. R.14-2 ¶¶ 15–17; R.22-1 ¶¶ 15–17. If Borges-Silva had spent 10 minutes per webmail response, it would have taken him only 4.2 hours to complete 25 webmail responses, which is well within the time expected for an employee to handle the primary responsibility of his job. *See* R.14-2 ¶¶ 7, 16–17; R.22-1 ¶¶ 7, 16–17. Accordingly, Borges-Silva had ample opportunity within the allotted time to meet the reasonable, quantitative expectations in the PIP, and he failed to do so.

17

Borges-Silva's primary evidence of pretext is a comparator theory. The Court has previously explained that one way to discredit an employer's justification is to show that "similarly situated employees of a different [protected classification] received more favorable treatment." *Royall v. Nat'l Ass'n of Letter Carriers*, 548 F.3d 137, 145 (D.C. Cir. 2008). The plaintiff must show that "all of the relevant aspects of [his] employment were 'nearly identical'" to those of the comparators. *Id.* (quoting *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995)); *see also Neuren*, 43 F.3d at 1514 ("[T]o show that she was similarly situated to the male employee, Neuren was required to demonstrate that all of the relevant aspects of her employment situation were 'nearly identical' to those of the male associate. Neuren offered no evidence to demonstrate *identity* of their situations.") (emphasis in original) (citation omitted). For instance, in *Neuren*, the Court noted that the plaintiff had failed "to demonstrate identity of" her situation with a male comparator because "it is undisputed that the male associate was lower in seniority than Neuren." *Neuren*, 43 F.3d at 1514.

Here, Borges-Silva's alleged comparators are not "nearly identical" to him. *Royall*, 548 F.3d at 145. Borges-Silva did not identify any employee who should have been placed on a PIP and was not, R.14-2 ¶ 29; R.22-1 ¶ 29, or who failed a PIP and was not removed. Borges-Silva was the only employee with primary responsibility for responding to webmail inquiries. R.14-2 ¶ 7; R.22-1 ¶ 7. The

individuals he identified were one and two grades below him.  R.14-2 ¶¶ 15–17; R.22-1 ¶¶ 15–17.  Accordingly, these individuals are not proper comparators. *Royall*, 548 F.3d at 145.

Further, the fact that the decisionmaker, Director Mosby, was selecting men to positions of an even higher grade than Borges-Silva indicates that she was not discriminating against him because of his sex.  *See* R.14-5 at 7 (confirming that Director Mosby made Siedschlag the permanent chief of the Branch in 2019); R.14-5 at 10 (Borges-Silva testifying that Deputy Division Director George Herndon, who reported to Director Mosby and was Siedschlag's supervisor, "exemplified the Peter principle" because he "was a man who was promoted to the point of incompetence").  It does not follow that Director Mosby would remove Borges-Silva because he is a man, while promoting other men to even higher positions of power, especially considering that Borges-Silva has testified that he believes these men were incompetent.

Borges-Silva proffered even less evidence suggesting his age played any role in the process or decision resulting in his separation from employment.  Director Mosby is five years older than him.  R.14-16 ¶ 8; R.1 ¶ 6.  Borges-Silva recognizes that one of his coworkers, Dian Overbey, whom he believes was more favorably treated, is older than him.  R.14-5 at 18.  He attempts to weaponize Overbey's purportedly favorable treatment as evidence of sex discrimination, while ignoring its

implication for his age discrimination claim (a claim which he admits "was not vigorously pursued," R.16 at 2 n.1). *See* R.22. at 7.

As for his evidence of retaliation, he cannot avoid his acknowledgment that his issues with Siedschlag started "[w]ithin days" of their meeting, long before Siedschlag learned of Borges-Silva's prior EEO activity.  R.25-4 at 2; *see also* R.14-5 at 9.  At most, Borges-Silva offers evidence that he did not get along with Siedschlag, not that Siedschlag's conduct was motivated by sex, by age, or by prior EEO activity.  And, more importantly here, he offers no evidence that Director Mosby's conduct in removing Borges-Silva after he failed his PIP was motivated by sex, age, or prior EEO activity.

## IV.    The District Court Appropriately Reviewed the Entire Record, <ins>Notwithstanding Counsel's Egregious Violations of the Standing Order.</ins>

This is not a case in which a judge declared that summary judgment should be entered because of a missed deadline or other procedural failing; rather, the District Court carefully reviewed "each exhibit and submission from the parties in support of and in opposition to the pending motions."  R.28 at 2 n.2.  The methodical opinion demonstrates how the record supports entry of summary judgment.  R.28 at 1–17.

The District Court noted that Borges-Silva had embedded in his opposition "a twenty-four-page 'Statement of Counter-Facts,' listing 161 largely redundant statements that regularly mix argument and fact."  R.28 at 2 n.3.  "Most of the statements are immaterial, as they do not bear on whether: (1) Defendant had a

legitimate non-pretextual reason to terminate Plaintiff; or (2) Plaintiff can rebut this reason with evidence of pretext." *Id.* As a "moreover" point, the District Court also noted that Borges-Silva failed to comply with the Court's Standing Order, *id.*, which required Borges-Silva, who is and was represented by counsel, to: (1) include any additional facts that it wishes to add "in consecutively numbered paragraphs at the end of its responsive statement of facts," R.10 ¶ 13(b)(vii), (2) file each exhibit "as a separate exhibit on ECF," R.10 ¶ 16, and (3) cite to "the *page number of the PDF file* that contains the cited material, not to any internal pagination within the document," R.10 ¶ 16 (emphasis in original). Borges-Silva, represented by counsel, ignored all three requirements.

Even with Borges-Silva's misreading of the District Court's footnote, the Federal Rules of Civil Procedure were designed so that a district court judge, facing a heavy docket, is not "obligated to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make his own analysis and determination of what may, or may not, be a genuine issue of material disputed fact." *Burke v. Gould*, 286 F.3d 513, 518 (D.C. Cir. 2002) (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988)); *Jimenez v. Mayorkas*, No. 21-5193, 2023 WL 2607385, at *2 n.2 (D.C. Cir. Mar. 23, 2023). Thus, where "the party opposing the motion fails to comply with this local rule, then 'the district court is under no obligation to sift through the record' and should '[i]nstead . . . deem as admitted the moving

party's facts that are uncontroverted.'" *SEC v. Banner Fund Int'l*, 211 F.3d 602, 616 (D.C. Cir. 2000) (alterations in original) (quoting *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 154 (D.C. Cir. 1996)); *see also Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 397 (D.C. Cir. 2020). A party represented by an experienced attorney should comply with the Court's rules. *See Morrissey v. Mayorkas*, 17 F.4th 1150, 1163 (D.C. Cir. 2021) (noting that "attorneys 'have a professional obligation to be' knowledgeable about 'procedural rules,' which 'are the tools of the trade,'" and that demanding compliance with those rules is appropriate "particularly as [plaintiff] was represented by counsel") (quoting *Ctr. for Nuclear Resp., Inc. v. U.S. Nuclear Regul. Comm'n*, 781 F.2d 935, 942 (D.C. Cir. 1986)). The District Court acted well within its authority in noting that a represented party failed to comply with its Order, and still it reviewed "each exhibit and submission from the parties in support of and in opposition to the pending motions." R.28 at 2 n.2.

\*     \*     \*

22

## CONCLUSION

For the foregoing reasons, the Court should summarily affirm the judgment below.

MATTHEW M. GRAVES
United States Attorney

BRIAN P. HUDAK
JANE M. LYONS
Assistant United States Attorneys

*/s/ Douglas C. Dreier*
DOUGLAS C. DREIER
Assistant United States Attorney
Civil Division
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-2551
douglas.dreier@usdoj.gov

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that the foregoing Motion for Summary Affirmance complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) and contains 5,145 words, as calculated by counsel's word processor.

*/s/ Douglas C. Dreier*
DOUGLAS C. DREIER
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 30th day of March, 2023, I have caused the foregoing Motion for Summary Affirmance to be served on Appellant's counsel by filing the Motion on the Court's CM/ECF system.  Counsel are registered users.

*/s/ Douglas C. Dreier*
DOUGLAS C. DREIER
Assistant United States Attorney

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **QUENTIN BORGES-SILVA,** | |
| **Plaintiff,** | |
| **v.** | No. 21-cv-474-ZMF |
| **JANE NISHIDA,** *Former Acting Administrator of the U.S. Environmental Protection Agency,* | |
| **Defendant.** | |

## ORDER

Upon consideration of Defendant's Motion for Summary Judgment, ECF No. 14, and for the reasons stated in the accompanying memorandum opinion, it is hereby

**ORDERED** that the Defendant's Motion for Summary Judgment is **GRANTED**.

This is a final, appealable order issued pursuant to Local Rule 73.1(a).

2023.01.13
11:08:01 -05'00'

_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **QUENTIN BORGES-SILVA,** | |
| **Plaintiff,** | |
| **v.** | **No. 21-cv-474-ZMF** |
| **JANE NISHIDA,** *Former Acting Administrator of the U.S. Environmental Protection Agency,* | |
| **Defendant.** | |

## <u>MEMORANDUM OPINION</u>

On February 16, 2020, the U.S. Environmental Protection Agency ("EPA") terminated Plaintiff Quentin Borges-Silva ("Borges-Silva") for unacceptable service. Borges-Silva sued the EPA Administrator ("Defendant") for wrongful termination,[1] claiming that the EPA unlawfully discriminated against him based on his age and gender and retaliated against him for complaining about a hostile work environment. Pending before the Court is Defendant's Motion for Summary Judgment, which the Court will GRANT.

---

[1] When Plaintiff filed this suit, Jane Nishida served as the Acting Administrator of the EPA. Now, Administrator Michael S. Regan is the proper defendant in this case. *See* 42 U.S.C. § 2000e-16(c).

I.   **BACKGROUND**[2]

    A.   <u>Factual Background</u>[3]

        1.   *EPA Employment and Prior Protected Activity*

Borges-Silva, a man born in 1965, *see* Def.'s Mem. P. & A. Supp. Mot. Summ. J. ("Def.'s Mem.") 6, ECF No. 14-1, was an Environmental Protection Specialist, GS-13,[4] in the EPA's Communication Services Branch ("Branch"), Field and External Affairs Division ("Division"), Office of Pesticide Programs, Office of Chemical Safety and Pollution Prevention ("Office"), *see* Def.'s Statement of Material Facts ("Def.'s Material Facts") ¶ 1, ECF No. 14-2. His primary

---

[2] Although each exhibit and submission from the parties in support of and in opposition to the pending motions has been reviewed, only those exhibits necessary to provide context for the resolution of the pending motions are cited herein.

[3] Plaintiff admitted thirty-eight out of forty-three of the statements in Defendant's Statement of Undisputed Facts. *See* Pl.'s Resp.  Def.'s Statement of Material Facts ("Pl.'s Resp."), ECF No. 22-1. These admitted statements largely form the factual background. Embedded in Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Plaintiff included a twenty-four-page "Statement of Counter-Facts," listing 161 largely redundant statements that regularly mix argument and fact. *See* Pl.'s Opp'n to Def.'s Mot.  Summ. J. ("Pl.'s Opp'n"), ECF No. 22. Most of the statements are immaterial, as they do not bear on whether: (1) Defendant had a legitimate non-pretextual reason to terminate Plaintiff; or (2) Plaintiff can rebut this reason with evidence of pretext. "[L]iberally mix[ing] facts with argument . . . does nothing to assist the court in isolating the material facts, distinguishing disputed from undisputed facts, and identifying the pertinent parts of the record." *Robertson v. Am. Airlines, Inc.*, 239 F. Supp. 2d 5, 9 (D.D.C. 2002) (citing *Burke v. Gould*, 286 F.3d 513, 518–19 (D.C. Cir. 2002)).

Moreover, Plaintiff failed to comply with Local Civil Rule 7(h)(1) and the Court's Standing Order, which required him to "furnish precise citations to the portions of the record on which [he] rel[ies]." Standing Order in Civil Cases ("Standing Order") ¶ 13, ECF No. 10; *see* LCvR 7(h)(1). Plaintiff's Statement of Counter-Facts does not include proper citations to the record and instead relies on the original pagination of the documents. *See* Standing Order ¶ 13(b). As such, the Court will decline Plaintiff's invitation to sift through hundreds of pages of depositions and affidavits to determine what may, or may not, be a genuine issue of material disputed fact. *See Burke v. Gould*, 286 F.3d 513, 517–18 (D.C. Cir. 2002); *see also Lawrence v. Lew*, 156 F. Supp. 3d 149, 154–55 (D.D.C. 2016) (detailed discussion of Local Civil Rule 7(h) and litigants' obligation to comply).

[4] The EPA largely pays employees on the General Schedule ("GS") pay scale, which has fifteen levels. *See* Salary Table 2023-GS, OPM.Gov, https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2023/GS.pdf.

responsibility was responding to "webmail inquiries," which members of the public submitted via the Office's "Contact Us" webpage. *See id.* ¶ 5–6. At all times relevant to the instant suit, Branch Chief Gregory Siedschlag (male, born 1978) served as Borges-Silva's first-line supervisor, and Division Director Jackie Mosby (female, born 1960) oversaw the Branch. *See* Def.'s Material Facts ¶¶ 2–3; Def.'s Mem. at 8.

On June 28, 2019, Borges-Silva filed an Equal Employment Opportunity ("EEO") claim. *See* Pl.'s Opp'n, Ex. 5, Compl. Discrimination in Federal Government ("Pl.'s Compl.") 1, ECF No. 22-3. On June 9, 2022, Equal Employment Opportunity Commission ("EEOC") Administrative Judge ("AJ") Robert D. Rose ruled that Borges-Silva "was subjected to a hostile work environment based on his sex and prior EEO activity, and placed on a [performance improvement plan] in reprisal for his prior EEO activity." Pl.'s Mot. Issue Preclusion & Stay, Ex. 1, Liability Hearing Bench Decision & Order ("EEOC Liability Ruling") 18, ECF No. 16-1. AJ Rose dismissed the claim that Borges-Silva was harassed based on his age. *See id.* at 3.

### 2. *Webmail Backlog Develops*

During the 2019 federal government shutdown, which lasted from December 31, 2018, to January 29, 2019, the Office developed a backlog of approximately 300 unanswered webmail inquiries. *See* Def.'s Mot. Summ. J. ("Def.'s Mot."), Ex. 2, Dep. Quentin Borges-Silva ("Pl.'s 2021 Dep.") 6, ECF No. 14-6. On March 19, 2019—Siedschlag's second day as permanent Branch Chief—Siedschlag discovered this backlog. *See* Decl. Gregory B. Siedschlag ("Siedschlag Decl.") ¶ 6, ECF No. 14-3. The next day, Siedschlag expressed concerns about the backlog to Borges-Silva. *See* Def.'s Material Facts ¶ 12. That same day, Siedschlag tasked three other employees— Enid Chiu (female, born 1988, GS-12 Environmental Protection Specialist), Marilyn St. Fleur (female, born 1985, GS-13 Environmental Protection Specialist), and Isabella Bennett (female,

born 1993, GS-11 Environmental Protection Specialist)—with assisting Borges-Silva with the backlog. *See* Siedschlag Decl. ¶ 7; Def.'s Mot., Ex. 14, Table of Branch Employees 2, ECF No. 14-18. By March 29, 2019, the four employees reduced the backlog to forty-one webmail inquiries. *See* Def.'s Material Facts ¶ 18; Pl.'s Resp. at 2. Siedschlag requested that each employee track their time. *See* Siedschlag Decl. ¶ 8. Chiu completed seventy-five webmail responses in 400 minutes, for a rate of 5.3 minutes per response. *See* Def.'s Mot., Ex. 13, Table of Time Comparators 2, ECF No. 14-17. Bennett completed seventy webmail responses in 706 minutes, for a rate of 10.1 minutes per response. *See id.* St. Fleur completed seventy-two webmail responses in 725 minutes, for a rate of 10.1 minutes per response. *See id.* Borges-Silva did not provide usable data. *See* Siedschlag Decl. ¶ 8 n.3.

Over the next six months, the webmail backlog regrew. *See* Siedschlag Decl. ¶ 8. On May 22, 2019, the backlog totaled 134 unanswered inquiries. *See* Def.'s Mot., Ex. 4, Pl.'s Performance Notes 4, ECF No. 14-8. On July 5, 2019, the backlog totaled 234 unanswered inquiries. *See* Def.'s Mot., Ex. 3, Emails from Siedschlag to Pl. ("Siedschlag Emails") 3, ECF No. 14-7. By August 30, 2019, the backlog reached approximately 510 unanswered inquiries. *See id.* at 2. Throughout that time, Siedschlag repeatedly instructed Borges-Silva to address the backlog. *See* Siedschlag Decl. ¶ 9. For example, on July 5, 2019, Siedschlag tasked Borges-Silva with eliminating the backlog of 234 inquiries by August 30, 2019. *See* Siedschlag Emails at 3. And on September 4, 2019, Siedschlag asked Borges-Silva to eliminate the backlog of 510 inquiries by November 13, 2019. *See id.* at 2. Siedschlag later adjusted this deadline to November 27, 2019, to provide Borges-Silva with official time to work on his EEO affidavit. *See* Def.'s Mot., Ex. 1, Dep. Quentin Borges-Silva ("Pl.'s 2022 Dep.") 25, ECF No. 14-5.

### 3. *Defendant Places Borges-Silva on a Performance Improvement Plan*

On September 27, 2019, Siedschlag informed Borges-Silva of his intention to place him on a performance improvement plan ("PIP") for unacceptable performance. *See* Siedschlag Decl. ¶ 10. On October 23, 2019, Siedschlag formally placed Borges-Silva on a PIP. *See* Def.'s Mot., Ex. 6, Performance Improvement Plan ("Pl.'s PIP"), ECF No. 14-10. The PIP period lasted from October 28, 2019 to November 27, 2019. *See id.* at 2. The PIP required Borges-Silva to prepare an average of at least twenty-five webmail responses per workday. *See id.* at 6. Siedschlag met with Borges-Silva weekly throughout the PIP period to provide feedback and guidance. *See* Pl.'s 2022 Dep. at 25. Siedschlag instructed Borges-Silva to prioritize simple inquiries that could be completed in twenty minutes or less. *See id.* at 25–26, 28–29.

During the PIP period, Borges-Silva sent a total of 244 webmail responses at an average of 13.6 per day. *See* Def.'s Mot., Ex. 7, Notification of Performance Improvement Plan Results ("PIP Results") 5, ECF No. 14-11. Of these, Borges-Silva copied his responses from form response language 109 times verbatim and sixty-four times partially. *See id.* at 6. As of December 2, 2019, the Office had a backlog of approximately 700 webmail inquiries, some of which dated back to July 2019. *See* Pl.'s 2022 Dep. at 38; Siedschlag Decl. ¶ 15.

### 4. *Defendant Terminates Borges-Silva*

On January 17, 2020, Siedschlag proposed removing Borges-Silva for unacceptable service. *See* Def.'s Mot., Ex. 8, Notice of Proposed Removal for Unacceptable Performance ("Removal Notice") 2, ECF No. 14-12. Mosby served as the deciding official for the proposed removal. *See id.* at 7. On February 14, 2020, Mosby issued her decision to implement the proposed removal. *See* Def.'s Mot., Ex. 9, Decision on Notice of Proposed Removal ("Removal Decision")

2, ECF No. 14-13. On February 16, 2020, Defendant terminated Borges-Silva. *See* Def.'s Mot., Ex. 10, Notification of Personnel Action 2, ECF No. 14-14.

       B.     <u>Procedural History</u>

On February 24, 2021, Borges-Silva filed this suit. *See* Compl., ECF No. 1. On June 21, 2021, Defendant filed his Answer. *See* Answer, ECF No. 7. On July 20, 2021, the parties consented to proceed before a U.S. Magistrate Judge for all purposes, and the matter was referred to the undersigned. *See* Joint Notice Consent Assign. Mag. Judge., ECF No. 9; Min. Order (July 22, 2021).

Following discovery, Defendant moved for summary judgment. *See* Def.'s Mot. On July 27, 2022, Borges-Silva moved for issue preclusion based on the AJ's liability ruling and to stay the summary judgment briefing. *See* Pl.'s Mot. Issue Preclusion & Stay, ECF No. 16. On August 8, 2022, this Court denied Borges-Silva's motion and ordered him to raise any issue preclusion arguments in his opposition to Defendant's motion for summary judgment. *See* Min. Order (Aug. 8, 2022). On August 25, 2022, Borges-Silva filed his opposition. *See* Pl.'s Opp'n. On October 18, 2022, Defendant filed his reply. *See* Def.'s Reply Supp. Mot. Summ. J. ("Def.'s Reply"), ECF No. 25.

## II.    **LEGAL STANDARD**

To succeed on a motion for summary judgment, the moving party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the initial

burden of demonstrating that there is no genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). If the moving party meets this burden, the nonmoving party must identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). In evaluating motions for summary judgment, the Court must review all evidence in the light most favorable to the nonmoving party and draw all inferences in the nonmoving party's favor. *See Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam). In doing so, the Court must not assess credibility or weigh the evidence. *See Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013). However, the nonmoving party "may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence[.]" *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790 (8th Cir. 2009) (quoting *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872–73 (8th Cir. 2005)). A genuine issue for trial must be supported by affidavits, declarations, or other competent evidence. *See* Fed. R. Civ. P. 56(c). If the nonmoving party's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50.

## III.  DISCUSSION

### A.  <u>Issue Preclusion</u>

Under "the doctrine of issue preclusion[,] . . . 'once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.'" *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). A prior holding has a preclusive effect when (1) "the same issue now being raised [was previously] contested by the parties and submitted for judicial determination in the prior case[,]" (2) "the issue [was] actually and necessarily determined by a court of competent jurisdiction in that prior case[,]"

and (3) "preclusion in the second case [would] not work a basic unfairness to the party bound by the first determination." *Id.* "[T]he moving party bears the burden of proving all the elements of issue preclusion." *Lans v. Adduci Mastriani & Schaumberg L.L.P.*, 786 F. Supp. 2d 240, 303 (D.D.C. 2011) (citing *Athridge v. Aetna Cas. and Sur. Co.*, 351 F.3d 1166, 1171 (D.C. Cir. 2003)).

This Court is not foreclosed from deciding whether Borges-Silva's termination was retaliatory because the "same issue" is not raised in Borges-Silva's EEOC case and this case. *Yamaha Corp. of Am.*, 961 F.2d at 254. By Borges-Silva's own omission, the issue in the EEOC case is: "[w]as the PIP valid?" Pl.'s Opp'n at 30. However, the issues here are (1) whether Defendant articulated legitimate nonretaliatory and nondiscriminatory reasons for removing Borges-Silva and (2) whether Borges-Silva rebutted Defendant's articulated reasons with evidence of pretext. *See* Def.'s Reply at 15–16. Given that the AJ did not address these questions in his liability ruling, "[a]n assessment of the remaining elements of issue preclusion is, therefore, not necessary." *Lans*, 786 F. Supp. 2d at 312. Accordingly, the Court will proceed to consider the remaining issues in this case.

B.     Discrimination and Retaliation

Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII]" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). If a plaintiff cannot present direct evidence of discrimination or retaliation, the court assesses his claims under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).

Under that framework, the employee must first make out a prima facie case of retaliation or discrimination under Title VII. *See Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019). To establish a prima facie case of discrimination, the plaintiff must show that "(1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 144 (D.C. Cir. 2008) (cleaned up). To establish a prima facie case of retaliation, the plaintiff must show that (1) "he engaged in statutorily protected activity;" (2) "he suffered a materially adverse action by his employer;" and (3) "a causal link connects the two." *Iyoha*, 927 F.3d at 574. Next, the burden shifts to the employer to articulate a legitimate nondiscriminatory and nonretaliatory reason for its action. *See McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012). In doing so, "the employer must 'articulate specific reasons for that applicant's qualifications such as seniority, length of service in the same position, personal characteristics, general education, technical training, experience in comparable work or any combination of such criteria.'" *Figueroa v. Pompeo*, 923 F.3d 1078, 1089 (D.C. Cir. 2019) (quoting *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003)) (cleaned up). If the employer makes this showing, "the burden-shifting framework disappears." *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004). The "central inquiry" then becomes "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory [and nonretaliatory] reason was not the actual reason and that the employer intentionally discriminated [or retaliated] against the plaintiff on a prohibited basis." *Iyoha*, 927 F.3d at 566 (quoting *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008)). In other words, the employee must demonstrate "pretext." *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009).

When the employer properly presents a legitimate nondiscriminatory and nonretaliatory reason for the challenged action, the district court "need not—and *should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Because Defendant asserted legitimate nondiscriminatory and nonretaliatory reasons for the challenged actions, the *Brady* shortcut applies. *See Barry v. Haaland*, No. 19-cv-3380, 2022 WL 4598518, at *6 (D.D.C. Sept. 29, 2022), *appeal filed*, No. 22-5268. Thus, the Court will proceed to step two.[5] *See id.*

1.    Defendant's    Legitimate    Nondiscriminatory    and    Nonretaliatory
       Justifications

Four factors are "paramount in the analysis" of whether an employer has met its burden: (1) the employer must produce admissible evidence; (2) "the factfinder, if it believe[s] the evidence, must reasonably be able to find that the employer's action was motivated by a nondiscriminatory [and nonretaliatory] reason;" (3) the employer's justification must be "facially credible in light of the proffered evidence;" and (4) the employer must provide a "clear and

---

[5] At step one, Borges-Silva primarily relies on temporal evidence to establish causation. *See* Pl.'s Opp'n at 33–34. He argues that the proximity between his June 2019 EEO complaint and February 2020 termination establishes but-for causation. *See id.* Although "mere temporal proximity may establish causation," *Keys v. Donovan*, 37 F. Supp. 3d 368, 372 (D.D.C. 2014), to do so, "the temporal proximity must be very close," *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (cleaned up). Indeed, numerous courts have found that three and four-month periods between plaintiffs' protected activity and adverse employment actions were insufficient to establish causation based on temporal proximity. *See id.* at 273–74 (collecting cases).

Defendant terminated Borges-Silva eight months after Borges-Silva filed his EEO complaint. *See* Def.'s Material Facts ¶¶ 20, 40. The eight-month gap between the protected EEO activity and the challenged employment action "is too attenuated to establish causation based on temporal proximity alone." *Clinton v. Granholm*, No. 18-cv-991, 2021 WL 1166737, at *10 (D.D.C. Mar. 26, 2021); *see also Kline v. Springer,* No. 07-0451, 2009 WL 10701432, at *2 (D.D.C. June 29, 2009) ("No reasonable juror could find retaliation from these facts [where] there was a time lapse of from five to six months . . . ."). Therefore, Borges-Silva likely failed to establish causation. *See Clinton*, 2021 WL 1166737, at *10.

reasonably specific explanation" for its action. *Figueroa*, 923 F.3d at 1087–88 (cleaned up). Defendant provided legitimate nondiscriminatory and nonretaliatory reasons for terminating Borges-Silva.

First, Defendant "has supported its justifications with evidence that the Court may consider at summary judgment, including deposition testimony [and] supporting emails[.]" *Arnoldi v. Bd. of Trs.*, 557 F. Supp. 3d 105, 115 (D.D.C. 2021) (cleaned up). Specifically, Defendant provided sworn statements from Siedschlag and Mosby; Borges-Silva's deposition testimony; comparator information; communications between Siedschlag and Borges-Silva about performance metrics; documents related to Borges-Silva's PIP; and documents related to Borges-Silva's removal.[6] Borges-Silva does not challenge the admissibility of this evidence. *See generally* Pl.'s Opp'n; Pl.'s Resp.

Second, Defendant need only "raise a genuine issue of fact as to whether the employer intentionally discriminated [or retaliated] against the employee" to satisfy its step two burden. *Figueroa*, 923 F.3d at 1087 (cleaned up). Defendant did so: evidence of poor work performance and "failure to follow supervisory instructions [are] legitimate reason[s] for . . . termination." *Arnoldi*, 557 F. Supp. 3d at 115. Between March 20, 2019, and September 19, 2019, Siedschlag expressed concerns to Borges-Silva on at least twelve occasions about his lackluster progress in eliminating the webmail backlog. *See* Def.'s Material Facts ¶ 12; Siedschlag Decl. ¶ 9. On September 27, 2019, Siedschlag notified Borges-Silva of his intention to place him on a PIP for unacceptable performance, having determined that Borges-Silva's "output was too low relative to

---

[6] *See* Siedschlag Decl.; Pl.'s 2021 Dep.; Pl.'s 2022 Dep.; Siedschlag Emails; Pl.'s Performance Notes; Pl.'s Compl.; Pl.'s PIP; PIP Results; Removal Notice; Removal Decision; Notification of Personnel Action; Def.'s Mot., Ex. 11, Siedschlag's EEO Aff., ECF No. 14-15; Def.'s Mot., Ex. 12, Mosby's EEO Aff., ECF No. 14-16; Table of Branch Employees; Table of Time Comparators.

both [his] expectations and to keep up with incoming webmail inquiries." Siedschlag Decl. ¶ 10.

Although the PIP required Borges-Silva to prepare at least twenty-five webmail responses per

workday, *see* Pl.'s PIP at 6, Borges-Silva completed an average of 13.6, *see* PIP Results at 5.

"[Borges-Silva's] subpar performance [is] evidence that [Defendant] had a legitimate

[nondiscriminatory and] nonretaliatory explanation for terminating [him]." *Williams v.*

*Smithsonian Inst.*, No. 14-cv-1900, 2019 WL 3859155, at *7 (D.D.C. Aug. 16, 2019) (citing

*George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005)). Therefore, a factfinder "could believe the

evidence and reasonably conclude that [Defendant] was motivated by the nondiscriminatory [and

nonretaliatory] reasons described [therein]." *Clinton*, 2021 WL 1166737, at *8.

Third, "the substantial evidence of [Borges-Silva's] substandard performance during his

tenure . . . renders [Defendant's nonretaliatory and] nondiscriminatory explanation for separating

him facially credible." *Williams*, 2019 WL 3859155, at *8. Siedschlag placed Borges-Silva on a

PIP, which Mosby deemed to be reasonable. *See* Removal Decision at 3. After Borges-Silva failed

to meet the PIP's requirements, Mosby determined that Borges-Silva's "incidents of unacceptable

performance . . . [were] fully supported by the evidence." *See id.* at 3. As a result, Mosby

implemented the proposed removal of Borges-Silva. *See id.* "Defendant's explanation is therefore

legitimate." *Albert v. Perdue*, No. 17-cv-1572, 2019 WL 4575526, at *4 (D.D.C. Sept. 20, 2019)

(citing *Figueroa*, 923 F.3d at 1088).

Fourth, Defendant's "explanations were sufficiently clear and specific to allow [Borges-

Silva] ample opportunity to bring forward evidence to 'disprove . . . [D]efendant's reasons.'"

*Clinton*, 2021 WL 1166737, at *9 (quoting *Figueroa*, 923 F.3d at 1088). Siedschlag tasked Borges-

Silva—the Office's only employee primarily focused on responding to webmail inquiries—with

reducing a significant webmail backlog. *See* Siedschlag Decl. ¶ 4; Def.'s Material Facts ¶ 5–7.

Borges-Silva does not contest that he failed to eliminate the backlog throughout 2019. *See* Pl.'s Opp'n at 34–35. "[Defendant's] consistent claim—one directly supported by the record—that it decided to discharge [Borges-Silva] because of his unsatisfactory job performance gave [Borges-Silva] a clear opportunity to challenge the asserted justification as merely a pretext for unlawful . . . discrimination [and retaliation.]" *Williams*, 2019 WL 3859155, at *8.

2. *Borges-Silva's Evidence of Pretext*

"The burden now shifts to [Borges-Silva] to provide sufficient evidence by which a reasonable jury could find [Defendant's] stated reason was pretext for discrimination [and] retaliation." *Albert*, 2019 WL 4575526, at *5 (citing *Brady*, 520 F.3d at 494).

To establish pretext, a plaintiff may show that the defendant provided a "false" explanation for its employment decision. *Lathram v. Snow*, 336 F.3d 1085, 1089 (D.C. Cir. 2003). "It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible." *Hogan v. Hayden*, 406 F. Supp. 3d 32, 46 (D.D.C. 2019) (quoting *Pignato v. Am. Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994)). Alternatively, an "employer's failure to follow established procedures or criteria" may also provide evidence of pretext allowing an employee to survive summary judgment. *Wang v. Wash. Metro. Area Transit Auth.*, 206 F. Supp. 3d 46, 68 (D.D.C. 2016) (quoting *Brady*, 520 F.3d at 495 n.3). Finally, a plaintiff may provide evidence of "variant treatment of similarly situated employees, discriminatory statements by decision[-]makers, [or] irregularities in the stated reasons for the adverse employment decision." *Bennett v. Solis*, 729 F. Supp. 2d 54, 60 (D.D.C. 2010) (citing *Brady*, 520 F.3d at 495 n.3).

First, Borges-Silva argues that "[t]here has been no objective documentation demonstrating [a legitimate basis for termination]." Pl.'s Opp'n at 34. However, record evidence consistently demonstrates that Defendant "notified [Borges-Silva] that his work was failing to meet

expectations and provided him with performance evaluations, both formal and informal, during his employment." *Williams*, 2019 WL 3859155, at *13; *see supra* n.6. Notably, Siedschlag expressed concerns about the webmail backlog as early as his second day as Branch Chief. *See* Def.'s Material Facts ¶ 12. And he continued to raise these concerns to Borges-Silva from March to November 2019. *See id.* ¶¶ 27, 30; Siedschlag Decl. ¶ 9. The concerns were based on objective metrics, including that lower-level employees cleared webmail inquiries significantly faster and that Borges-Silva could not clear the minimal threshold set in his PIP. *See* Removal Decision at 3; Siedschlag Decl. ¶ 8. Moreover, the deciding official, Mosby, independently vetted Siedschlag's recommendation before terminating Borges-Silva. *See* Removal Decision at 2–3. Borges-Silva does not "challenge[] these objectively measurable standards of his job performance." *Williams*, 2019 WL 3859155, at *12. Based on this evidence, Borges-Silva had ample notice that the webmail backlog was a cause for Defendant's concern. *See id.* at *13. "Because [Defendant's] stated belief about the underlying facts is reasonable in light of the evidence, a jury cannot conclude that [Defendant] is lying about the reasons for [Borges-Silva's] separation." *Id.* at *9 (cleaned up).

Second, Borges-Silva contends that Defendant disregarded established procedures by failing to transfer him to a different supervisor after he alleged harassment by Siedschlag, and by failing to give him adequate time to complete his complaint. *See* Pl.'s Opp'n at 34–35. In support, Borges-Silva cites a 1,577-page exhibit but provides no pin cite to the referenced policy. *See id.* This alone disqualifies this argument. *See Lawrence*, 156 F. Supp. 3d at 154. Nonetheless, Defendant—who provided the exact authority, *see* Def.'s Reply at 27 (citing Pl.'s Compl. at 1541–57)—"compl[ied] with established agency criteria or procedures in conjunction with [Borges-Silva's] separation." *Williams*, 2019 WL 3859155, at *9 (citing *Wang*, 206 F. Supp. 3d at 68). Although Defendant's policy states that "corrective action . . . may include . . . reassignment of the

alleged harasser[,]" it by no means makes this remedial measure mandatory on the agency. Pl.'s Compl. at 1550. And "failure to follow [Defendant's] own policies" where the "policy confer[red] substantial discretion on the decision maker . . . and [Borges-Silva] offered no evidence showing that [Defendant] applied the policy differently to [Borges-Silva] than it did to other employees" does not demonstrate pretext. *Chambers v. Fla. Dep't of Transp.*, 620 Fed. App'x 872, 879 (11th Cir. 2015).

Third, Borges-Silva asserts that colleagues of different ages and genders were not subject to the same scrutiny as him. *See* Pl.'s Opp'n at 37. "A plaintiff can establish pretext masking a discriminatory [or retaliatory] motive by presenting 'evidence suggesting that the employer treated other employees of a different [group] . . . more favorably in the same factual circumstances.'" *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (quoting *Brady*, 520 F.3d at 495). "But to serve as a comparator, the other employee must be 'similarly situated' to the plaintiff." *Clinton*, 2021 WL 1166737, at *11 (quoting *Burley*, 801 F.3d at 301). "Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018).

Borges-Silva's proffered comparators—the three individuals assigned to assist with the 2019 federal government shutdown backlog—were not comparable. *See* Table of Branch Employees at 2; *see also Emami v. Bolden*, 241 F. Supp. 3d 673, 689–90 (E.D. Va. 2017) ("[A] showing of similarity to comparators 'would include evidence that the employees dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the

employer's treatment of them for it.'") (cleaned up) (quoting *Haywood v. Locke*, 387 Fed. App'x 355, 359 (4th Cir. 2010)). The individuals who assisted Borges-Silva only worked on reducing the webmail backlog for nine days, while simultaneously completing their other full-time responsibilities. *See* Siedschlag Decl. ¶¶ 7–8. Yet Borges-Silva's primary responsibility throughout 2019 was to respond to webmail inquiries. *See id.* at ¶ 8. As such, "a reasonable jury could not find that [the proffered comparators] and [Borges-Silva were] comparable 'in all material respects'" where the comparators "performed many of the same duties as [Borges-Silva,]" but not "all." *Day v. Carnahan*, No. 19-cv-5551, 2021 WL 4192069, at *4 (N.D. Ill. 2021). The differences between the proffered comparators and Borges-Silva are underscored by the fact that the other three Environmental Protection Specialists cleared webmail inquiries at a far faster rate than Borges-Silva. *Compare* Table of Comparators at 2, *with* PIP Results at 5. Comparators are "not similarly situated" where they "performed at a higher level than [the plaintiff]." *Chambers*, 620 Fed. App'x at 879. Furthermore, the proffered comparators "had [not] been placed on a PIP" and had "no[t] required the level of assistance that [Siedschlag] described [Borges-Silva] as needing." *Chambers*, 620 Fed. App'x at 879. Because Borges-Silva "fail[ed] to produce evidence that the proposed comparators were actually similarly situated to him, an inference of falsity or discrimination [or retaliation] is not reasonable, and summary judgment is appropriate." *Walker v. McCarthy*, 170 F. Supp. 3d 94, 108 (D.D.C. 2016) (cleaned up).

Fourth, "there can be no reasonable inference of [] discrimination where an individual just happens to be a member of a protected class—actionable discrimination only occurs when any employer acts *because of* the plaintiff's status as a member of a protected class." *Washington v. Chao*, 577 F. Supp. 2d 27, 42 (D.D.C. 2008) (cleaned up) (emphasis added). As such, "[c]ourts in our District have repeatedly held that a decision-maker's inclusion in the same protected class as

16

the terminated plaintiff cuts against any inference of discrimination." *Ranowsky v. Nat'l R.R. Passenger Corp.*, 244 F. Supp. 3d 138, 144 (D.D.C. 2017). Here, Borges-Silva and Siedschlag are both men, and Borges-Silva and Mosby are close in age. *See* Def.'s Mem. at 8; *see also Perry v. Shinseki*, 783 F. Supp. 2d 125, 138 (D.D.C. 2011) (decision-maker's membership in the same protected class as the plaintiff "weighs further against an inference of discrimination") (citing *Kelly v. Mills*, 677 F. Supp. 2d 206, 223 (D.D.C. 2010)). Thus, Borges-Silva's claim that Defendant had a discriminatory or retaliatory animus when terminating him is unavailing.

Finally, the Court is not a "super-personnel department that reexamines an entity's business decisions." *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007) (cleaned up). "[F]or the most part, [Borges-Silva] concedes the facts underlying Defendant's proffered reasons[,]" and his "contentions boil down to justifications of [his] conduct." *Arnoldi*, 557 F. Supp. 3d at 115; *see* Pl.'s Opp'n at 34–37. Even so, "[t]he Court's task is not to decide whether [Defendant] made the right calls, only whether [his] stated reasons were not the actual reasons. And [Borges-Silva's contentions] do not undermine [Defendant's] stated reasons." *Arnoldi*, 557 F. Supp. 3d at 118 (cleaned up). Accordingly, summary judgment is appropriate. *See Clinton*, 2021 WL 1166737, at *9–11.

## IV.   CONCLUSION

For the foregoing reasons, the Court will GRANT Defendant's Motion for Summary Judgment in an accompanying order. As such, judgment is entered as a matter of law in favor of Defendant.

Date: January 13, 2023

2023.01.13
11:09:07
-05'00'

_____

ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE